Richard WEISSMAN, Plaintiff,

v.

TRANSCONTINENTAL PRINTING
U.S.A. INC., Defendant.

No. CIV.A.01–6245.

United States District Court,
E.D. Pennsylvania.

June 4, 2002.

Lillian E. Benedict, Benjamin E. Zuckerman, Cozen and O'Connor, Philadelphia, PA, for Plaintiff.

Risa B. Greene, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, Senior District Judge.

This case involves a written employment contract between plaintiff, Richard Weissman, and his former employer, defendant and counterclaimant Transcontinental Printing U.S.A., Inc. At issue are monetary payments and the viability of a restrictive covenant under New York law. After a hearing on the parties' cross-motions for summary judgment and a bench trial commencing May 29, 2002, the court makes the following findings of fact and conclusions of law:

*Background*

1. In 1987, Richard Weissman ("Weissman") was hired to work for Spectra Graphics, a company engaged in the business of printing direct marketing materials for large-volume customers.

2. In October 1999, Spectra Graphics was sold to Transcontinental Printing U.S.A. Inc. ("TPU"), a subsidiary of Transcontinental Printing, Inc. ("TPI").

3. TPU and TPI are both subsidiaries of G.T.C. Transcontinental Group Ltd., a Canadian corporation based in Montreal, Canada (collectively, G.T.C. Transcontinental Group Ltd. and all of its subsidiaries are referred to herein as "GTC").

4. As of October 31, 2000, GTC identified at least 68 companies as subsidiaries. The businesses of GTC, carried out through its subsidiaries, are a variety of printing, distribution, publishing and technology services.

5. After the acquisition of Spectra Graphics by TPU, Weissman was retained as President and General Manager of TPU. TPU prints direct mail advertising materials, both personalized and nonpersonalized, and also manufactures business forms.

6. This action arises out of the employment agreement entered into by Weissman and TPU on October 14, 1999 and later supplemented by a letter agreement of December 7, 2000 (collectively, the "Employment Agreement").[1] Weissman was represented by counsel in reviewing, negotiating and agreeing to the terms of the Employment Agreement.

7. Section 9.1 of the Employment Agreement states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of conflict of laws thereof." Both parties agree that the interpretation of the Employment Agreement and whether it is enforceable should be decided in accordance with New York law.

8. Under the Employment Agreement, Weissman's term of employment with TPU was for three years.

9. In addition to a base salary of $150,000.00 per annum, TPU agreed to pay Weissman an annual incentive award pursuant to Section 5.2 of the Employment Agreement (the "Annual Incentive Award") and a supplementary bonus pursuant to Section 5.3 (the "Supplementary Bonus") at the end of each fiscal year during the term of employment.

10. During Weissman's employment with TPU, his responsibilities included promoting a more unified and cohesive approach to sales and service among GTC's several different direct mail subsidiaries, and encouraging the cross-marketing of these subsidiaries' services to each other's customers.

11. In brief, Section 7.1 of the Employment Agreement precluded Weissman, without the prior written consent of defendant, from using or disclosing any confidential information, including trade secrets, at any time during or after his employment with TPU.

12. In brief, Section 7.2 of the Employment Agreement precluded Weissman, without the prior written consent of defendant, from working for certain companies competing in certain ways with TPU, TPI, or any affiliates, parents or subsidiaries during his employment with TPU and for one year (or up to two years if so elected by the defendant) after any termination of Weissman without cause.

13. In brief, Section 7.3 of the Employment Agreement precluded Weissman, without the prior written consent of defendant, from diverting business from or soliciting customers or employees of TPU, TPI, or any affiliates, parents or subsidiar-

---

1. Neither party disputes that the contract governing the rights of the parties in this case consists of the October 14, 1999 and December 7, 2000 writings taken together.

ies during his employment with TPU and for one year (or up to two years if so elected by the defendant) after any termination of Weissman without cause.

14. In addition to his base salary of $150,000.00 per year during employment, plus bonuses, Weissman was entitled to additional base salary payments under Sections 6.3 and 7.4 after any early termination without cause. Such payments were to be paid, in the same manner as his salary had been paid while he was employed by TPU, for the duration of one year after such termination, as well as for any additional period for which the defendant elected to extend the terms of the noncompetition and nonsolicitation covenants.

15. In November 2000, TPU notified Weissman that his employment was to be terminated without cause.

16. Thereafter, Weissman and TPU negotiated and executed the letter agreement dated December 7, 2000 (the "Letter Agreement").

17. The Letter Agreement stated that Weissman was terminated without cause and that his employment with TPU ended on February 23, 2001.

18. In the Letter Agreement TPU agreed to pay Weissman, among other things, the Annual Incentive Award of $30,000.00 and a Supplementary Bonus in the amount of $70,000.00, both to be paid in January 2001.

19. In the Letter Agreement TPU also agreed to pay Weissman $150,000.00 in post-termination base salary payments for the year following his termination as provided in Section 6.3 of the Employment Agreement.

20. Additionally, in the Letter Agreement Weissman agreed to abide by the provisions of Section 7 of the Employment Agreement for one year following his ter-

mination of employment with TPU. The defendant elected not to extend the periods of noncompetition and nonsolicitation as it could have done under Section 7.4.

21. Following Weissman's termination on February 23, 2001, in accordance with the terms of the Employment Agreement and the Letter Agreement, TPU began to issue base salary payments to Weissman and also paid him a total of $100,000 in Annual Incentive Award and Supplementary Bonus money.

22. Prior to Weissman's termination, Weissman introduced Mark Weiss and Steve Katz at a meeting on January 22, 2000. Mark Weiss is Weissman's nephew and president of a company called Color-Quick, LLC ("ColorQuick"), and Katz is a consultant for a Czechoslovakian printing press manufacturer. The January 22, 2001 meeting was for the purpose of assisting Katz, who worked for a printing press manufacturer and sought advice from Mark Weiss.

23. Also prior to Weissman's termination, Weissman attended a meeting on February 21, 2001 at the invitation of Larry Weiss, who is the co-founder of Color-Quick, the father of Mark Weiss, and Weissman's brother-in-law. A new product in development by ColorQuick, known as MagSend, was discussed at this meeting, but Weissman testified that he merely listened at this meeting and there was no evidence or other reason to persuade the court otherwise.

24. In March, 2001, after Weissman's termination from TPU, Larry Weiss approached Weissman about working for Co-lorQuick to help market MagSend. In brief, MagSend is a computer program that electronically determines whether an advertisement to be published in a magazine is properly formatted in accordance with that magazine's specifications. Mag-

Send enables the advertiser to send a digital file of the proposed advertisement over the Internet, compares the format of the proposed advertisement to the magazine's specifications, automatically makes adjustments to the proposed advertisement if it does not meet those specifications, permits the advertiser to view the adjusted advertisement by computer, and ultimately transmits the adjusted advertisement to the magazine publisher. The functions that MagSend performs are known as "preflight" functions, and MagSend is designed to perform these preflight services in a manner that is more time- and labor-efficient than traditional methods of performing preflight services. Preflight services must be performed in order to professionally print many different types of products; MagSend, however, is able to perform preflight functions only for advertisers who are attempting to place advertisements in magazines.

25. In April, 2001, Weissman accepted ColorQuick's offer of employment. Weissman's job at ColorQuick consists solely of attempting to sell and market MagSend to magazine publishers. There is absolutely no evidence that after his termination, Weissman engaged in any work or activity on any other product or business other than MagSend. ColorQuick has corporate and business relationships with another company,[2] Composing Room Inc. t/a CRW Graphics ("CRW"), but there is no evidence that Weissman at any time engaged in any activities for CRW, which is engaged in the business of direct mail printing.

26. Weissman began to receive salary payments in mid-June for his work with MagSend after he reached agreement with ColorQuick regarding the financial terms of his employment. These terms were memorialized in a June 14, 2001 writing specifying a salary of $12,500.00 per month or $150,000.00 per year, plus certain expenses, benefits, and a bonus to be later determined. The memorandum further stated that salary payments were to be effective April 2001, so that Weissman ultimately received payments reflecting work he had done for ColorQuick starting in April, 2001.

27. In March 2001, TPU obtained information that it believed indicated that Weissman was working for ColorQuick and/or CRW. TPU continued to issue post-termination base salary payments to Weissman while it attempted to determine whether the information it received was accurate. After meeting with Weissman and his attorney and reviewing materials provided by them, TPU concluded that Weissman was competing in violation of his Employment Agreement, and by letter dated June 19, 2001 TPU through its counsel advised Weissman that it believed he was violating Section 7 of the Employment Agreement.

28. TPU issued $54,807.88 in post-termination base salary payments to Weissman for the period of February 24, 2001 to July 8, 2001, but did not pay him any base salary payments for the period of July 9, 2001 to February 23, 2002. After TPU discontinued its payments to Weissman, Weissman filed the instant lawsuit.

29. In short, Weissman seeks declaratory judgment as to the unenforceability of the noncompetition clause (Count I). Weissman also argues that regardless of the legality of the noncompetition clause, he is entitled to a total of $150,000.00 in post-termination base salary payments on the

---

**2.** CRW and ColorQuick share a president, Mark Weiss; CRW performs certain administrative functions for ColorQuick; CRW loaned ColorQuick one million dollars in seed money; and CRW owns 82% of ColorQuick.

basis of his early termination alone, *i.e.,* that such amount was bargained-for solely in exchange for his early severance from TPU. Accordingly, Weissman brings a breach of contract claim (Count II) seeking that portion of the $150,000.00 in post-termination base salary payments that he has not received up to December 9, 2001, in the amount of $95,192.12.[3] He also brings state law claims under Pennsylvania's Wage Payment and Collection Law (the "WPCL"), 43 PA. CONST. STAT. § 260.1 *et seq.,* seeking wages due, attorneys' fees, and liquidated damages (Count III).

30. On the other hand, defendant claims that the noncompetition clause is enforceable and that plaintiff breached that clause, and seeks a return of the $54,807.88 in post-termination base salary payments and of the $100,000.00 in bonus money already paid to plaintiff. Specifically, defendant brings claims for breach of contract (Counterclaim Count I), unjust enrichment (Counterclaim Count II), and promissory estoppel (Counterclaim Count III).[4]

*Contract Terms*

31. Under New York law, "[c]ontractual language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *John Hancock Mut. Life Ins. Co. v. Amerford Intern. Corp.,* 22 F.3d 458, 461 (2d Cir.1994) (punctuation, citation omitted). "Where ... [contractual] language is unambiguous, the words plain and clear, conveying a distinct idea, there is no occasion to resort to other means of interpretation. Effect must be given to the intent as indicated by the language employed." *Western Union Tel. Co. v. American Communications Ass'n, C.I.O.,* 299 N.Y. 177, 184, 86 N.E.2d 162 (N.Y.1949) (punctuation, citation omitted); *see also Tracz v. Schafer,* 107 A.D.2d 869, 484 N.Y.S.2d 684, 685 (N.Y.App.Div. 1985) ("The terms of plaintiff's compensation plan is clear and unambiguous and it is not necessary to resort to·parol evidence to determine the parties' intent."). "[I]nterpretation of an unambiguous contract provision is a function for the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument." *Chimart Associates v. Paul,* 66 N.Y.2d 570, 572–3, 498 N.Y.S.2d 344, 489 N.E.2d 231 (N.Y.1986).

32. On the other hand, "[w]here the meaning is ambiguous the construction involves questions of fact for the jury." *Quinn v. Buffa,* 97 A.D.2d 752, 468 N.Y.S.2d 173, 173 (N.Y.App.Div.1983). Where a writing "permit[s] different inferences, and fair-minded and reasonable men may disagree as to their meaning and effect and the real contract between the parties ... [and] when the sense in which the words of a written instrument are used, or the sense in which the promisor had reason to believe the promisee understood them, is determinable from the relation of the parties, facts apart from it, and the surrounding circumstances, it must be found and fixed by the jury." *J. & R. Lamb v. Norcross Bros. Co.,* 208 N.Y. 427, 431, 102 N.E. 564 (N.Y.1913). Furthermore, "when the language employed is not free from ambiguity, or when it is equivo-

---

3. Although the Complaint states that plaintiff seeks approximately $63,461.64, it is apparent that plaintiff seeks $95,192.12 as stated in later submissions and by counsel.

4. Defendant withdraws Count IV of the Counterclaim, which was grounded in fraud. *See* Def.'s Pretrial Mem. at n. 1; Def.'s Resp. to Plf.'s Mot. for Partial Sum. J. at n. 1.

cal, and its interpretation depends upon the sense in which the words were used, in view of the subject to which they relate, the relation of the parties, and the surrounding circumstances properly applicable to it, the intent of the parties becomes a matter of inquiry, and the interpretation of the language used by them is a mixed question of law and fact." *Lachs v. Fidelity & Cas. Co. of New York,* 306 N.Y. 357, 364, 118 N.E.2d 555 (N.Y.1954).

33. Section 6.3 of the Employment Agreement states, in relevant part,

[TPU] may terminate [Weissman]'s employment hereunder without Cause at any time and for any reason. If [TPU] terminates [Weissman]'s employment hereunder without Cause at any time during the 18 month period immediately following the Commencement Date, the Term of Employment shall thereupon end and [Weissman] shall only be entitled to, unless otherwise provided pursuant to Section 7.4 below, (a) Base Salary continuation at the rate in effect (as provided in Section 5.1 of this Agreement) on the date of termination for a one-year period commencing on such date of termination, and (b) a pro rata portion of the Annual Incentive Award for the year of such termination, if any.

34. Section 5.1 states, in relevant part, "During the Term of Employment, [Weissman] shall receive a base salary of $150,000 per annum ('Base Salary') payable in accordance with [TPU]'s normal payroll practices."

35. Section 7.4 states, in relevant part,

[TPU], in its sole discretion, may, in the event of [Weissman]'s termination of employment without Cause, elect to extend the duration of the Noncompetition and Nonsolicitation provisions contained in Sections 7.2 and 7.3 above beyond the duration provided for in such Sections .... If [TPU] elects to so extend the

term of the provisions of Sections 7.2 and 7.3, [Weissman] shall be entitled to Base Salary continuation at the rate in effect (as provided in Section 5.1 of this Agreement) on the date of termination through the last day of the extended term of the Noncompetition and Nonsolicitation provisions.

36. Section 7.2, the noncompetition provision, is the focus of both parties' efforts in this litigation and states, in relevant part,

[Weissman] shall not during the Term of Employment, and ... if his employment with [TPU] is Terminated by [TPU] without Cause, for the period during which [Weissman] is entitled to Base Salary continuation pursuant to Section 6.3 above, ... directly or indirectly, within or with respect to anywhere within a one hundred (100) mile radius of the Newtown Facility (as defined in the Asset Purchase Agreement) (a) engage, without the prior express written consent of [TPU], in any business or activity, whether as an employee, officer, consultant, partner, principal, agent, representative, stockholder or in any other individual, corporate or representative capacity, or render any services or provide any advice to any business, activity, person or entity, if such business, activity, service, person or entity, directly or indirectly, competes in any material manner with: (i)[TPU], (ii)[TPI], (iii) any affiliate, including any direct or indirect parent or subsidiary, or (iv) any product, service or other business of any such entities which is in production, distribution or development as of the date of any such termination, and/or (b) meaningfully assist, help or otherwise support, without the prior express written consent of [TPU], any person, business, corporation, partnership or other entity or activity, whether as an employee, consultant, partner, princi-

pal, agent, representative, stockholder or in any other individual, corporate or representative capacity, to create, commence or otherwise initiate, or to develop, enhance or otherwise further, any business or activity if such business or activity, directly or indirectly, competes (or is reasonably likely to compete) in any manner with any significant business or activity of [TPU], [TPI] or any parent or subsidiary.

37. Section 7.3 contains a covenant relating to non-solicitation and states, in relevant part,

> [Weissman], during the Term of Employment, and ... if his employment with [TPU] is Terminated by [TPU] without Cause, for the period during which [Weissman] is entitled to Base Salary continuation pursuant to Section 6.3 above (unless otherwise provided in Section 7.4 below): (a) take any action to solicit or divert any business (or potential business) or clients or customers (or potential clients or potential customers) away from [TPU], [TPI] or any affiliate, including any direct or indirect parent or subsidiary, (b) induce customers, potential customers, clients, potential clients, suppliers, agents or other persons under contract or otherwise associated or doing business with [TPU], [TPI] or any affiliate, reduce or alter any such association or business with or from [TPU], [TPI] or any affiliate, and/or (c) induce any person in the employment of [TPU], [TPI] or any affiliate or any consultant to [TPU], [TPI] or any affiliate to i) terminate such employment, or consulting arrangement, ii) accept employment, or enter into any consulting arrangement, with anyone other

than [TPU], [TPI] or any affiliate, and/or iii) interfere with the customers, suppliers, or clients of [TPU], [TPI] any affiliate in any manner or the business of [TPU], [TPI], or any affiliate in any manner.[5]

This provision also includes definitions of the terms "potential client," "potential customer," and "potential business."

38. In addition to the noncompetition and nonsolicitation provisions, the Employment Agreement also contains Section 7.1, which states, in relevant part,

> [Weissman] shall not, during the Term of Employment and at any time thereafter, without the prior express written consent of the Board, directly or indirectly, use any Confidential Information (as defined below) in any way, or divulge, disclose or make available or accessible any Confidential Information to any person, firm, partnership, corporation, trust or any other entities or third party (other than when required to do so in good faith to perform [Weissman]'s duties and responsibilities under this Agreement or when required to do so by a lawful order of a court of competent jurisdiction).... For the purposes of this Agreement, "Confidential Information" shall mean all information respecting the business and activities of the [TPU] or [TPI], any parent, any affiliate, and/or any subsidiary, including, without limitation, the terms and provisions of this Agreement, the clients, customers, suppliers, officers, employees, consultants, computer or other files, projects, products, computer disks or other media, computer hardware or computer

---

**5.** The court notes that this provision, as agreed to by the parties, lacks a critical verb. However, it is clear to the court that this provision was intended to prohibit Weissman from engaging in the activities described therein and neither party has suggested otherwise. Furthermore, neither party has seriously litigated the meaning of this provision or its application to the facts of this case.

software programs, marketing plans, financial information, methodologies, know-how, trade secrets, processes, practices, approaches, projections, forecasts, formats, systems, data gathering methods and/or strategies of [TPU] or [TPI], any parent, any affiliate, and/or any subsidiary. Notwithstanding the immediately preceding sentence, Confidential Information shall not include any information that is, or becomes, generally available to the public (unless such availability occurs as a result of [Weissman]'s breach of any portion of this Section 7.1 or any other obligation [Weissman] owes to [TPU], any parent, any affiliate, and/or any subsidiary).

39. The contract clearly states that the corporation was to make post-termination base salary payments for one year after termination without cause, during which time plaintiff also agreed to abide by the noncompetition and nonsolicitation provisions.[6] It is also clear that pursuant to Section 7.4, the corporation had the right to extend the periods of noncompetition and nonsolicitation and that, had it chosen to do so, it would have been obligated under the contract to pay base salary payments for the duration of the extended noncompetition and nonsolicitation period in addition to the original one-year period after termination. Section 5.3, specifying the length of the period during which the base salary payments were owed, explicitly cross-references section 7.4, which discussed the possible extension of the noncompetition and nonsolicitation periods

and requires the payments of base salary during any such extended period.

40. Since the company's obligation to make post-termination base salary payments was explicitly related under the terms of the contract not only to plaintiff's early termination without cause, but also to the time period during which the nonsolicitation and noncompetition provisions were in effect, the contract unambiguously indicates that these payments were intended to compensate Weissman both for his early termination as well as for his agreements not to compete or solicit.[7] Additional support for this finding is that Section 7.6 of the Employment Agreement states, in relevant part, that TPU was "entitled to cease making any payments or providing any benefits hereunder and to equitable and/or injunctive relief to prevent any breach or threatened breach of this section 7, and to specific performance of each of the terms of such Section in addition to any other legal or equitable remedies that [TPU] may have." This provision, taken in light of the fact that the contract did not provide for a severance payment in a lump sum but rather in installments distributed over a period of time, further suggests that the intent of the parties was to condition the post-termination base salary payments on plaintiff's continued adherence to the terms of the nonsolicitation and noncompetition provisions.

*Enforceability of the Noncompetition Clause*

 41. "There is, in short, general judicial disfavor of anticompetitive covenants

---

6. Plaintiff's adherence to the confidentiality provision was ongoing according to the terms of the contract.

7. Even if the language of the contract were ambiguous as to this point, testimony given at trial supports this interpretation of the contract. In addition, the parties exchanged documents in the spring of 2001 in an effort to

determine whether plaintiff's employment with ColorQuick in fact violated the noncompetition clause; these documents imply a continuing belief on the part of both parties that future salary payments hinged on whether plaintiff was in fact violating the noncompete clause.

contained in employment contracts." *American Broadcasting Cos. Inc. v. Wolf,* 52 N.Y.2d 394, 403, 438 N.Y.S.2d 482, 420 N.E.2d 363 (N.Y.1981). More specifically, "[i]t is well established that restrictive covenants that tend to prevent an employee from pursuing a similar vocation upon termination or retirement from employment are disfavored by the law." *John Hancock Mut. Life Ins. Co. v. Austin,* 916 F.Supp. 158, 163 (N.D.N.Y.1996). "Important ... are the powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood. At the same time, the employer is entitled to protection from unfair or illegal conduct that causes economic injury. The rules governing enforcement of anticompetitive covenants and the availability of equitable relief after termination of employment are designed to foster these interest of the employer without impairing the employee's ability to earn a living or the general competitive mold of society." *Wolf,* 52 N.Y.2d at 404, 438 N.Y.S.2d 482, 420 N.E.2d 363 (punctuation, citations omitted).

42. "The modern, prevailing common-law standard of reasonableness for employee agreements not to compete applies a three-pronged test. A restraint is reasonable only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public. A violation of any prong renders the covenant invalid." *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 388–89, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999) (punctuation, citations omitted; emphasis in original). "In this context a restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably bur-

densome to the employee." *Id.* at 389, 690 N.Y.S.2d 854, 712 N.E.2d 1220.

43. As to the first prong of the *BDO Seidman* test, which requires the covenant to meet a legitimate employer interest, courts "recognize the legitimate interest an employer has in safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy. Thus restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information." *Reed, Roberts Associates, Inc. v. Strauman,* 40 N.Y.2d 303, 308, 386 N.Y.S.2d 677, 353 N.E.2d 590 (N.Y.1976). "[A] court will normally not decree specific enforcement of an employee's anticompetitive covenant unless necessary to enforce trade secrets, customer lists or good will of the employer's business, or perhaps when the employer is exposed to special harm because of the unique nature of the employee's services." *Wolf,* 52 N.Y.2d at 403, 438 N.Y.S.2d 482, 420 N.E.2d 363. As no party argues that Weissman's services are unique or extraordinary, to be enforceable Section 7.2 must serve to protect trade secrets, confidential customer lists, or good will. The court is not persuaded that the clause at issue protects these interests.

44. As described previously, in addition to Section 7.2, the Employment Agreement also contains Sections 7.1 and 7.3 broadly prohibiting Weissman's use or disclosure of confidential information, including trade secrets and customers, as well as prohibiting any diversion of business by Weissman and his solicitation of current and potential clients. It is abundantly clear that these other provisions, Sections 7.1 and 7.3, were intended to protect the defendant's legitimate interests, and thus that Section 7.2 was intended solely to restrict Weissman from employment with competitors. *See*

*Lucente v. International Business Machines Corp.,* 117 F.Supp.2d 336, 349 (S.D.N.Y.2000) (in declaring noncompetition provision unenforceable, court noted that existence of separate agreements protecting trade secrets and confidential information "demonstrates that the enforcement of the noncompete would not have been necessary" to protect legitimate employer interests), *reconsidered on other grounds,* 146 F.Supp.2d 298 (S.D.N.Y. 2001).

■■■ 45. A blanket restriction on competitive employment of an individual, with no purpose to protect trade secrets or confidential customer information, is not a legitimate interest for which a restrictive covenant will be enforced. In *Columbia Ribbon & Carbon Manufacturing Co., Inc., v. A–1–A Corporation,* 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (N.Y. 1977), the Court of Appeals of New York refused to enforce an express covenant barring a salesman 1) from disclosing customer names or any other information acquired during his former employment "insofar as [such information] is or may be necessary to protect the Company's business," and 2) from selling any products similar to those sold by his former employer. *Id.* at 498–99, 398 N.Y.S.2d 1004, 369 N.E.2d 4. The *Columbia Ribbon* court did not reach the question of whether the temporal and geographic limitations of the covenant were reasonable, but rather declared the covenant unenforceable on the grounds that it was intended not to serve any legitimate employer purpose, stating that "[i]t is clear that [the covenant's] broadsweeping language is unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness. It does no more than baldly restrain competition. This may not do." *Id.* at 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4. Also, in *Ivy Mar Co., Inc. v.*

*C.R. Seasons Ltd.,* 907 F.Supp. 547, 559–60 (E.D.N.Y.1995), the court indicated that a covenant barring a former employee from selling "various" unspecified products and from communicating with "prospective" customers would be unenforceable as a matter of law, because it did not serve to protect legitimate business interests but simply did "no more than baldly restrain competition." Similarly, in this case, in light of Sections 7.1 and 7.3 that separately protect trade secrets, confidential consumer lists and consumer good will, the clear purpose of the noncompetition provision of Section 7.2 is to preclude any competitive advantage another company might gain in employing Weissman, that is, to "baldly restrain competition."

46. In addition, in *Wolf,* 52 N.Y.2d at 397–98, 438 N.Y.S.2d 482, 420 N.E.2d 363, the Court of Appeals of New York refused to enforce a contractual provision against a well-known television broadcaster that required him, after the expiration of his employment with the network ABC, to 1) negotiate in good-faith with ABC for 90 days and 2) provide ABC with a right of first refusal for an additional period of time. Although *Wolf* differs from this case in the type of contractual provision at stake and the remedy sought, the public policies expressed by the Court of Appeals in *Wolf* are generally applicable here. As the *Wolf* court explained, "[u]nderlying the strict approach to enforcement of these covenants is the notion that, once the term of an employment agreement has expired, the general public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition." *Id.* at 404, 438 N.Y.S.2d 482, 420 N.E.2d 363 (punctuation, citations omitted). Thus, the *Wolf* court refused to "unduly interfere with an individual's livelihood and to inhibit free competition where there is no corresponding injury to

the employer other than a loss of competitive edge." *Id.* at 405, 438 N.Y.S.2d 482, 420 N.E.2d 363. Here, although there is no interference with Weissman's "livelihood" in the sense that he received full salary payments during the noncompete period, the contract in this case requires, for no legitimate purpose, the removal of a productive and skilled employee from a marketplace. *See Reed, Roberts,* 40 N.Y.2d at 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 ("[O]ur economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas. Therefore, no restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment."); *see also Wolf,* 52 N.Y.2d at 406, 438 N.Y.S.2d 482, 420 N.E.2d 363 (public policy favors "free exchange of goods and services through established market mechanisms").

47. Defendant argues that the court should enforce Section 7.2 because Weissman was financially compensated for his agreement not to take competitive employment. Although whether the noncompetition agreement imposes "undue hardship" on the employee is one of the prongs in the three-prong test of *BDO Seidman,* 93 N.Y.2d at 388–89, 690 N.Y.S.2d 854, 712 N.E.2d 1220, "a violation of *any* prong renders the covenant invalid." *Id.* (emphasis added). Although noncompetition

clauses have been upheld as reasonable in cases where the former employee was compensated for his or her agreement not to compete, in such cases the noncompetition clause was specifically found to be necessary to protect some legitimate purpose of the employer. *See, e.g., Maltby v. Harlow Meyer Savage,* 166 Misc.2d 481, 633 N.Y.S.2d 926 (N.Y.Sup.Ct.1995) (former employees' relationships with customers were unique, and period of paid noncompetition was reasonable to permit those relationships to be rebuilt by a new employee); *Lumex v. Highsmith,* 919 F.Supp. 624 (E.D.N.Y.1996) (former employee paid for period of noncompetition had gained confidential information, the use of which for a competitor would be greatly detrimental to former employer); *see also id.* at 632 (citing *Baxter International, Inc. v. Morris,* 976 F.2d 1189 (8th Cir.1992) (former employee was paid for period of noncompetition, but court refused to prevent him from working for competitor and enforced only prohibition against disclosing trade secrets)). Thus, the fact that plaintiff is paid during his period of noncompetition is not dispositive of the enforceability of the noncompete provision.

48. However, there is no doubt that Weissman's activities after his termination violated the literal language of Section 7.2 as agreed to by the parties.[8] On the other hand, at no time before his termination did

---

8. As discussed, MagSend performs via computer preflight functions necessary for the placement of advertisements in magazines, and is intended to save time and labor costs associated with the performance of those functions in more traditional ways. Thus, MagSend competes in a material manner with more traditional means of performing preflight services, and those advertisers or publishers using MagSend gain a business advantage over those performing preflight services in other ways. TPU, which manufactures business forms and prints direct mail packages, does not perform preflight services specifically for magazine advertisers. However, at least two other subsidiaries of GTC, Transcontinental Digital Services and Transcontinental Media, do perform preflight functions for magazine advertisements, and another subsidiary that publishes dozens of magazines also performs preflight functions for magazine advertisements. Thus, Weissman's employment on behalf of MagSend violates the literal terms of Section 7.2(a), since MagSend competes in a material manner with the services and businesses of TPU's affiliates.

plaintiff breach the literal terms of Section 7.2 as agreed to by the parties,[9] nor did he at any time violate Section 7.1 regarding confidential information or Section 7.3 regarding nonsolicitation.[10]

9. There is no evidence or basis on which to find that the January 22, 2001 meeting constituted a breach of the literal terms of the Employment Agreement as agreed to by the parties, particularly as to the requirement that Katz or his business, which Weissman assisted by setting up the meeting, competed in "a material manner" with, or competed with any "significant" business of, defendant or its affiliates. Similarly, there is no evidence or basis on which to find that Weissman's mere attendance at the meeting on February 21, 2001 violated the literal terms of Section 7.2. Thus, defendant cannot succeed on its claim to recover the $54,807.88 in post-termination base salary payments and the $100,000.00 in bonuses on the basis that Weissman breached his contract while still employed with defendant.

10. To the extent that Sections 7.1 and 7.3 meet the three-prong test in *BDO Seidman*, 93 N.Y.2d at 388–89, 690 N.Y.S.2d 854, 712 N.E.2d 1220, they are partially enforceable as plaintiff was represented by counsel when he agreed to them and there was no evidence of bad faith on the employer's part. *See id.* at 394–96, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (valid portions of overbroad restrictive covenant may be enforceable if employer has "demonstrated an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct"). To the extent that Sections 7.1 and 7.3 are enforceable, Weissman has not violated either provision because his new job does not involve use or disclosure of any trade secrets, confidential customer lists, or good will. There is no evidence that information obtained by Weissman about TPU or any of its parents, affiliates or subsidiaries qualifies as a protectable trade secret or other type of confidential information. *See Ivy Mar Co.*, 907 F.Supp. at 556–58 (setting forth requirements for establishing whether information qualifies as a trade secret); *cf. Lumex*, 919 F.Supp. at 629–30 (noncompetition clause enforced where high-level employee, in business where being "first to market" was critical to success, had been privy to former employer's plans for new products, future markets, and sensitive

*Remedy*

49. Plaintiff thus succeeds on his claim for declaratory judgment as to the unenforceability of the noncompetition clause.

financial information, and had attempted to take new job with direct competitor). Furthermore, while Weissman was well-acquainted with TPU and with the services of its direct-mail affiliates, any trade secrets of these companies are simply not useful to him to TPU's detriment in his new employment as a marketer of preflight software to magazine publishers. *Cf. Lumex*, 919 F.Supp. at 632 (noncompetition agreement enforceable where, due to nature of new employment, employee "must inevitably disclose [former employer's] trade secrets and confidential information"). Also, while his old and new jobs both relate to preflight services, Weissman may use general knowledge gained thought his former employment. *See Reed, Roberts*, 40 N.Y.2d at 309, 386 N.Y.S.2d 677, 353 N.E.2d 590 (knowledge of "business intricacies" not protected "[w]here knowledge does not qualify as a trade secret and there has been no conspiracy or breach of trust resulting in commercial piracy"). Furthermore, although defendant claims that Weissman improperly solicited two TPU customers, only confidential customer lists are protected and in his case both customers were "readily ascertainable ... as prospective users or customers of the employers' services or products." *DataType International, Inc. v. Puzia*, 797 F.Supp. 274, 284 (S.D.N.Y.1992); *see also Reed, Roberts*, 40 N.Y.2d at 308, 386 N.Y.S.2d 677, 353 N.E.2d 590 (employee engaged in no wrongful conduct where potential customers were readily discoverable through public sources). Nor was there any evidence that Weissman, in soliciting these customers, relied on any good will established during his tenure with TPU. *See BDO Seidman*, 93 N.Y.2d at 391–92, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (no legitimate interest of employer in protecting customers relationships that were not built through resources of the employer).

The court notes that even assuming that Section 7.2 were enforceable to the same extent as Sections 7.1 and 7.3, there is of course no breach of Section 7.2 for the same reasons that there is no breach of Sections 7.1 and 7.3.

50. Plaintiff, however, cannot succeed on his claim to recover the balance of the $150,000.00 in post-termination base salary payments based on the premise that he is entitled to such money solely because he was terminated early, as the court has determined that these payments were intended as consideration not only for his early termination but also for his agreements not to compete and not to solicit.

51. However, having declared Section 7.2 unenforceable, and in light of the defendant's counterclaim under the theory of unjust enrichment, the court must determine the parties' financial rights and obligations under the facts of this case.

■■■■ 52. The first question to be addressed is whether the unenforceable provision is severable so as to permit enforcement of the remainder of the agreement. Generally, "where the agreement consists in part of an unlawful objective and in part of lawful objectives, under certain circumstances the illegality may be severed and the legal components enforced." *McCall v. Frampton*, 81 A.D.2d 607, 438 N.Y.S.2d 11 (N.Y.App.Div.1981). "Whether the parties intended to treat both agreements as mutually dependent contracts, the breach of one undoing the obligations under the other, is a question of fact. In determining whether contracts are separable or

entire, the primary standard is the intent manifested, viewed in the surrounding circumstances." *Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (N.Y.1972). Also, "[t]he test is the degree to which the illegality vitiates the agreement, and the resolution of this question depends on the effect of performance of the legal portion of the agreement and the prevention of unjust enrichment, issues which ... must [be determined at] trial." *Stephan v. Shulman*, 130 A.D.2d 484, 515 N.Y.S.2d 67, 69 (N.Y.App.Div.1987).

■■■■ 53. In this case, the illegal noncompetition clause does not vitiate the agreement as a whole, but can be severed from the other provisions of the Employment Agreement, as was intended by the parties [11] and as provided for by law. *See, e.g., Saratoga State Waters Corporation v. Pratt*, 227 N.Y. 429, 441, 125 N.E. 834 (N.Y.1920) (questionably illegal covenant to arbitrate was "not so interwoven with the other agreement of the instrument so as to affect its integrity and validity").

■■■■ 54. Although it is a closer question as to whether the illegal noncompetition clause vitiates the specific agreement for post-termination base salary payments, the court finds that it does not,[12] particu-

---

**11.** Section 7.7 of the Employment Agreement states that

[t]he terms and provision of this Section 7 are intended to be separate and divisible provisions and if, for any reason, any one or more of them is held to be invalid or unenforceable, neither the validity nor the enforceability of any other provision of this Agreement shall thereby be affected. It is the intention of the parties to this Agreement that the potential restrictions on [Weissman]'s future employment imposed by this Section 7 be reasonable in both duration and geographic scope and in all other respects. If for any reason any court of competent jurisdiction shall find any pro-

visions of this Section 7 unreasonable in duration and geographic scope or otherwise, [Weissman] and [TPU] agree that the restrictions and prohibitions contained herein shall be effective to the fullest extent allowed under applicable law in such jurisdiction.

Section 9.5 further states that "[t]he invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement."

**12.** In the alternative, were the court to determine that the illegal noncompetition provision was integral to the agreement for post-termination base salary payments and conse-

larly as that agreement had certain legal purposes (to compensate plaintiff for his early termination and nonsolicitation) in addition to its illegal purpose. "[W]here a promisee has ... given lawful consideration for two promises, one legal, the other illegal, enforcement of the lawful promise may be permitted." *Murray Walter, Inc., v. Sarkisian Brothers, Inc.,* 107 A.D.2d 173, 486 N.Y.S.2d 396, 399 (N.Y.App.Div. 1985). "A lawful promise made for a lawful consideration is not invalid by reason only of an unlawful promise being made at the same time and for the same consideration." *Central New York Telephone and Telegraph Company v. Averill,* 199 N.Y. 128, 140, 92 N.E. 206 (N.Y.1910). *Cf. In re Kopf's Estate,* 73 Misc. 198, 132 N.Y.S. 719, 720 (N.Y.Sur.1911) (where consideration consisted of one illegal promise and another against public policy, entire contract was vitiated). Thus, the court may enforce the valid portion of the post-termination base salary payments agreement.

55. The question in this context is what, if any, portion of the bargained-for $150,000.00 in post-termination base salary payments represents compensation for Weissman's early termination and agreement not to solicit, as opposed to compensation for his promise not to compete. Weissman should obtain or retain the former, but not the latter. If the contract

governs this issue, then a claim for unjust enrichment cannot lie. *See Briggs v. Goodyear Tire & Rubber Company,* 79 F.Supp.2d 228, 236 (W.D.N.Y.1999) ("Settled law indicated that the equitable claim[ ] of unjust enrichment ... [is] unavailable where plaintiffs have rights under a valid and enforceable contract.").

56. The contract is silent on the question of what, if any, portion of the $150,000.00 in post-termination base salary payments represented compensation for Weissman's early termination or agreement not to solicit,[13] as opposed to his agreement not to compete, raising a matter for a fact finder to resolve. *See Joseph Sternberg, Inc. v. Walber 36th Street Associates,* 187 A.D.2d 225, 594 N.Y.S.2d 144 (N.Y.App.Div.1993) (where contract established real estate broker's commission only where sale was consummated for specified price, but sale price was not the· price specified, matter was to be resolved at jury trial, and claim for recovery under quantum meruit was not barred). The language of the contract, representations by counsel and testimony at trial established that the parties did not agree as to what post-termination base salary payments defendant would make to plaintiff were the noncompetition provision declared invalid. Thus, the court turns to principles of quantum meruit to determine

---

quently not severable from that agreement, the court would be required to declare the entire agreement for early termination to be unenforceable. Under those circumstances, defendant would likely recover payments it made under that provision, offset by plaintiff's losses due to defendant's failure to employ him for his full term of three years as mitigated by plaintiff's new employment at the same salary defendant had paid him. Under those circumstances, judgment would appear to be identical to that determined by the court in the body of this writing.

13. The only provision of the contract potentially applicable in this context is Section 7.6

of the Employment Agreement, which states that TPU was "entitled to cease making any payments or providing any benefits hereunder and to equitable and/or injunctive relief to prevent any breach or threatened breach of this section 7, and to specific performance of each of the terms of such Section in addition to any other legal or equitable remedies that the Corporation may have." However, as there was no breach or threatened breach of any enforceable portion of section 7, Section 7.6 is not operable in this context and defendant cannot claim a right to have ceased payments.

what, if any, payments are deserved by plaintiff.[14]

■ 57. "[I]n order to make out a claim in quantum meruit, a claimant must establish (1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Martin H. Bauman Associates, Inc. v. H & M Intern. Transport, Inc.,* 171 A.D.2d 479, 567 N.Y.S.2d 404, 408 (N.Y.App.Div.1991).

58. In this case, the "service" for which compensation was expected by plaintiff is clearly defendant's early termination of plaintiff.[15] The court finds that the reasonable value of this "service" is compensation equal to that which he would have been paid had he not been terminated early until the time that he returned to paid employment.

59. Plaintiff was hired on October 14, 1999 for a three-year term, and was terminated on February 23, 2001. He did not receive payments from ColorQuick until June 14, 2001, but those payments ultimately reflected compensation for work that he had done for ColorQuick starting in April, 2001 and at the same rate that he was previously paid, that is, $150,000.00 per year. Therefore, plaintiff was without paid employment only from Saturday, February 23, 2001 until Saturday, March 31, 2001, for a total of five weeks plus one Saturday. TPU paid Weissman a total of $54,807.88 after his termination, reflecting base salary payments for the period commencing on Saturday, February 24, 2001 through Thursday, July 8, 2001, for a total of 16 weeks minus one Friday.[16] Thus, Weissman received nearly 11 weeks of post-termination base salary payments, but lacked paid employment for only 5

14. In *Lucente,* 117 F.Supp.2d at 349, the contract explicitly required the forfeiture of incentive bonuses (paid in the form of stock options) if the employee took competitive employment, but the court declared the noncompetition agreement to be unenforceable. Rather than engaging in a *quantum meruit* approach, however, the court simply awarded the stock options as bargained for under the contract. *Id.* In *Lucente,* the legal purpose of the bonus payments was to compensate the employee for superb past performance, presumably in an amount relative to his profitability, and thus the payments had essentially been earned and calculated without regard to the noncompetition clause. In contrast, the payments in this case were clearly intended to compensate plaintiff not only for the consequences of his early termination, but for such consequences as heightened or amplified by the effect of the restrictive covenants, making a quantum meruit determination more appropriate in this case.

15. Although the $150,000.00 in post-termination base salary payments were also bargained for in exchange for plaintiff's adherence to the partially enforceable non-solicitation agreement, the court finds that the parties did not intend, and the plaintiff is not entitled to, any money to be paid for such adherence in and of itself.

16. The court notes that the $54,807.88 paid to Weissman, which both parties describe as representing the contractually bargained-for post-termination base salary payments for the period from February 24, 2001 through July 8, 2001, reflects total payments greater than $3,125.00 per week, *i.e.,* $150,000.00 divided by 12 months and further divided by four weeks. This discrepancy was not discussed by either party, and the court does not have any information as to the precise method or calculation of payment, which according to the Letter Agreement of December 7, 2000 was to be "in accordance with the customary payroll practices of Transcontinental." The court further notes that the Letter Agreement also obligated the company to pay Weissman for his accrued vacation time within 30 days of February 24, 2001, which may perhaps accounts for the discrepancy. Regardless, the court proceeds in its calculations on the clear evidence that Weissman's post-termination base salary payments were for $150,000.00 per year, resulting in weekly payments of $3,125.00.

weeks. The court finds that five weeks of post-termination base salary payments reasonably compensate Weissman for his early termination and nonsolicitation, as they compensate him for the time during which he lacked paid employment on account of his early termination. Thus, plaintiff has been unjustly enriched in the amount of 11 weeks minus one day of post-termination base salary payments, and accordingly, plaintiff owes defendant $33,750.00.

60. Because there are no wages due to plaintiff, plaintiff cannot succeed on his claims for attorneys' fees or liquidated damages under the WPCL, the state law wage collection act. *See* 43 PA. CONST. STAT. § 260.1 *et seq.*

### *JUDGMENT*

**AND NOW**, this 4th day of June, 2002, judgment is entered on the claims in **FAVOR** of defendant, Transcontinental Printing U.S.A. Inc., and **AGAINST** plaintiff, Richard Weissman, in the amount of $33,750.00.